[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Youngstown City School Dist. Bd. of Edn. v. State*, Slip Opinion No. 2020-Ohio-2903.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-2903

YOUNGSTOWN CITY SCHOOL DISTRICT BOARD OF EDUCATION ET AL., APPELLANTS, *v*. THE STATE OF OHIO ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Youngstown City School Dist. Bd. of Edn. v. State*, Slip Opinion No. 2020-Ohio-2903.]**

*Schools—Academic-distress commissions—Community learning centers—2015 Am.Sub.H.B. No. 70—Constitutionality—Three-Consideration Rule— Article II, Section 15(C) of the Ohio Constitution—Bill as enacted does not violate constitutional requirement for three considerations when amendment to a bill does not vitally alter the original bill—City school boards—Article VI, Section 3 of the Ohio Constitution merely entitled electors to choose the number of members and the organization of the district board of education.*

(No. 2018-1131—Submitted October 23, 2019—Decided May 13, 2020.)

APPEAL from the Court of Appeals for Franklin County,

No. 17AP-775, 2018-Ohio-2532.

———————————

**O'CONNOR, C.J.**

{¶ 1} In this appeal, we are asked to determine whether 2015 Am.Sub.H.B. No. 70 ("H.B. 70") or the process by which it was enacted violates the Ohio Constitution. For the reasons explained below, we hold that the bill does not usurp the power of city school boards, as alleged, in violation of Article VI, Section 3 of the Ohio Constitution and that it received sufficient consideration for purposes of Article II, Section 15(C). Thus, we affirm the judgment of the Tenth District Court of Appeals.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} On February 18, 2015, H.B. 70 was introduced in the Ohio House of Representatives. As introduced, the bill's purpose was to enact new sections within R.C. Chapter 3302 to authorize school districts and community schools to create community learning centers at schools where academic performance is low. The bill defined a "community learning center" as a "school * * * that participates in a coordinated, community-based effort with community partners to provide comprehensive educational, developmental, family, and health services to students, families, and community members during school hours and hours in which school is not in session." H.B. 70, Section 1. The bill as introduced was ten pages long.

{¶ 3} That day, February 18, the House considered H.B. 70 for the first time. On February 25, 2015, the House considered the bill a second time and referred it to the House Education Committee. On May 19, 2015, the House considered the bill a third time and then passed it.

{¶ 4} The bill was introduced in the Senate and considered for the first time on May 20, 2015. On May 27, 2015, the Senate considered the bill a second time and referred it to the Senate Education Committee.

{¶ 5} On June 24, 2015, the Senate Education Committee reported the bill back to the Senate with two amendments. One amendment expanded the definition

of facilities that were eligible to become community learning centers, and the other modified the structure of academic-distress commissions under existing law. When it was reported out of committee, the bill had increased from 10 to 77 pages. A significant portion of the amended bill consisted of revisions to the existing law on academic-distress commissions, including the requirement in R.C. 3302.10(C)(1) that for any district that has received an overall grade of "F" on its state report card for three consecutive years, R.C. 3302.10(A)(1), a commission must appoint a chief executive officer who has "complete operational, managerial, and instructional control" over the district. The final bill still provided for the creation of community learning centers—the original focus of H.B. No. 70.

{¶ 6} The entire Senate considered H.B. 70 for the third time later that day. The Senate adopted two additional but substantially shorter amendments on the Senate floor. One amendment set forth a residency requirement for at least one of the members of an academic-distress commission. The second amendment clarified that a chief executive officer for a school district appointed by an academic-distress commission would serve at the pleasure of the commission. After adopting the amendments, the Senate passed the bill.

{¶ 7} The House received the Senate's version of the bill on the same day that the Senate passed it. The House voted to concur in the Senate's amendments to the bill. Governor Kasich then signed the bill into law, and the legislation became effective October 15, 2015. H.B. 70 remained 77 pages in its final form.

{¶ 8} Appellants, Youngstown City School District Board of Education; AFSCME Ohio Council 8, AFL-CIO; Ohio Education Association; Youngstown Education Association; and Jane Haggerty (collectively, the "Youngstown School Board"), moved for declaratory judgment and permanent injunction in the Franklin County Court of Common Pleas, challenging the constitutionality of H.B. 70 and the General Assembly's legislative process in enacting it. The Youngstown School Board argued that the law violated Article II, Section 15(C) and Article VI, Section

3 of the Ohio Constitution. Article II, Section 15(C) requires that every bill "be considered by each house on three different days," and Article VI, Section 3 provides that a city school district has the power "by referendum vote to determine for itself the number of members and the organization of the district board of education."

{¶ 9} The trial court held an evidentiary hearing and then denied appellants' motion for preliminary injunction, holding that the Youngstown School Board did not have a substantial likelihood of success on the merits, did not prove that there would be irreparable harm or undue hardship without an injunction, and did not establish that the public interest would be served by an injunction. The Youngstown School Board appealed, but the Tenth District Court of Appeals dismissed the appeal sua sponte for lack of a final, appealable order and remanded the case to the trial court.

{¶ 10} On remand, the parties agreed to submit the issues for final determination by the trial court based on the evidence submitted at the preliminary-injunction hearing and on the parties' briefs. On October 11, 2017, the trial court denied the Youngstown School Board's motion for permanent injunction and declaratory judgment, holding that H.B. 70 did not violate Article II, Section 15(C) or Article VI, Section 3 of the Ohio Constitution. The trial court also granted appellees the state of Ohio; Paolo DeMaria,[1] Superintendent of Public Instruction; and the Ohio Department of Education judgment in their favor as a matter of law.

{¶ 11} On appeal, the Tenth District affirmed, concluding that appellants had failed to show that the General Assembly violated Article II, Section 15(C) of the Ohio Constitution, because "H.B. No. 70 as introduced and Am.Sub.H.B. No. 70 as adopted shared a common purpose of providing measures to improve

---

1. The complaint named Dr. Richard A. Ross, former Superintendent of Public Instruction. Pursuant to S.Ct.Prac.R. 4.06(B), the current superintendent, Paolo DeMaria, is automatically substituted as an appellee.

underperforming schools." 2018-Ohio-2532, 104 N.E.3d 1060, ¶ 23. However, the dissenting judge argued that the amendments to H.B. No. 70 vitally altered the legislation and therefore the bill was passed in violation of Article II, Section 15(C). *Id*. at ¶ 47-48. The appeals court further held that H.B. 70 did not violate Article VI, Section 3 of the Ohio Constitution because the bill did not give the chief executive officer authority to perform all of the school board's functions. *Id.* at ¶ 29.

{¶ 12} The Youngstown School Board sought this court's discretionary review, and we accepted the following propositions of law for review:

> The Ohio Constitution's Three Reading Rule is a mandatory provision. A bill allowing school boards and communities to jointly provide supportive services to schools that is transformed overnight into an amended bill imposing the installation of unelected CEOs imbued with complete operational, managerial, and instructional control of school districts must comply with the Three Reading Rule.
>
> Am. Sub. HB 70, which radically amended R.C. 3302.10 to include the appointment of an unelected chief executive officer who is vested with complete operational, managerial, and instructional control of a school district, usurps the powers of elected boards of education in violation of Ohio Constitution Article VI, Section 3.

*See* 153 Ohio St.3d 1503, 2018-Ohio-4285.

## II. ANALYSIS

{¶ 13} We must determine whether H.B. 70 or the process by which it was enacted violates the Ohio Constitution. This case is readily resolved by application of existing standards.

## A. The Three-Consideration Rule

{¶ 14} The first proposition requires us to consider the three-consideration clause of the Ohio Constitution, which states:

> Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house.

Article II, Section 15(C), Ohio Constitution. We have held that "where it can be proven that the bill in question was not considered the required three times, the consequent enactment is void and without legal effect." *Hoover v. Franklin Cty. Bd. of Commrs.*, 19 Ohio St.3d 1, 3, 482 N.E.2d 575 (1985). However, the bill need not contain exactly the same language in each of the three readings to be valid. "[A]mendments which do not vitally alter the substance of a bill do not trigger a requirement for three considerations anew of such amended bill. But, '[w]hen the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days * * *.' " (Citations omitted.) *Id.* at 5, quoting *Miller v. State*, 3 Ohio St. 475, 482 (1854).

{¶ 15} We later characterized a vitally altered bill as one "departing entirely from a consistent theme." *State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 233, 631 N.E.2d 582 (1994). However, we recognized that we "would be setting dangerous and impracticable precedent" by identifying a bright line distinguishing bills that are heavily amended from those that are vitally altered. *Id.* Instead, we explained that a court's key consideration should be whether the bill maintained a common purpose both before and after its amendment.

{¶ 16} In *Voinovich*, we concluded that a bill retained its common purpose, despite heavy amending, *id*., when the bill began as a 4-page-long biennial appropriation for the Bureau of Workers' Compensation but eventually passed with 20 pages of amendments that replaced the five-member Industrial Commission with a three-member one and changed various substantive and procedural laws relating to workers' compensation. We held that these amendments could be distinguished from the ones in *Hoover,* a case in which we had held that a bill was vitally altered because it had been introduced to enact provisions related to criminal nonsupport but was amended to enact provisions related to the financing, acquisition, and construction of nonprofit hospital and healthcare facilities.

{¶ 17} In this case, the parties do not contest that each chamber considered H.B. 70 on three different days, and no party argues that there was a vote to suspend the three-consideration requirement. The Youngstown School Board contends that the three considerations of the bill by each chamber do not pass constitutional muster, because the bill that the House considered on all three occasions and that the Senate considered on the first two occasions was materially different than the bill that the Senate considered on the third occasion and that the House ultimately passed. The state counters that the bill that was originally introduced had the same common purpose as the bill that was eventually passed: improving education in underperforming school districts.

{¶ 18} We agree with the state. The versions of H.B. 70 as introduced and as enacted had a common purpose of seeking to improve underperforming schools, even though there are differences in the tools through which each version pursued that goal. Despite the introduced and enacted bills' differences, they are more similar to the bills at issue in *Voinovich*, in which we found no vital alterations, than to the ones in *Hoover*, in which the bill had been vitally altered. Specifically, when first introduced, the bills in *Voinovich* and the present case started out with a relatively minor proposed change. In *Voinovich*, the proposed bill was to

appropriate funding for the Bureau of Workers' Compensation, and in this case, the proposed bill introduced community learning centers as a tool to improve underperforming schools. Both bills then underwent substantial changes. In *Voinovich*, the enacted bill changed procedures for the adjudication of workers' compensation claims, and in this case, the enacted bill changes the process for outside intervention in an effort to improve underperforming schools. However, in both *Voinovich* and the present case, the themes of the bills as introduced and as enacted were consistent. Furthermore, in this case, the text of the bill as introduced remained in the enacted bill. The changes were therefore not in theme or even in purpose but simply in the method chosen to pursue the General Assembly's goals. That stands in stark contrast with the bills at issue in *Hoover*, in which the themes and purposes of the bill as introduced and as enacted were entirely different and none of the original text remained in the final wording.

{¶ 19} We are sympathetic to the Youngstown School Board's argument that the process here was different than in *Voinovich*. In *Voinovich*, we recognized that although the bill was heavily amended between readings, "both houses deliberated * * * for several months. Hearings were held" and the governor announced that "he would veto any appropriations bill that did not also substantially reform the underlying workers' compensation system." *Voinovich*, 69 Ohio St.3d at 234, 631 N.E.2d 582. By contrast, here, the evidence establishes that the Senate Education Committee reported out a heavily amended H.B. 70 on June 24 and the House and Senate passed that amended version on the same day. However, the three-consideration rule does not require any specific level of deliberation or debate as long as the bill is not vitally altered, and this court has explained that it will not put itself "in the position of directly policing every detail of the legislative amendment process when bills are passed containing a consistent theme." *Voinovich* at 234.

8

**{¶ 20}** Similarly, the three-consideration rule does not allow this court to consider the legislative proceedings leading to an amendment. A substantial portion of the first dissenting opinion is devoted to recounting the "clandestine" process that led to the enactment of H.B. 70, but the law, including our precedent, limits our review of the bill. It is not our role to police how the amended language came into existence. Accordingly, ¶ 66-88 of the first dissenting opinion are superfluous.

**{¶ 21}** Further, the dissenting opinion does not meaningfully distinguish this case from *Voinovich*. The purpose of the original bill in *Voinovich* was to fund the Bureau of Workers' Compensation. In that case, this court found that during the legislative process, the bill was "heavily amended" but not "vitally altered" even though the amended bill "abolished the five-member Industrial Commission of Ohio, created a new three-member Industrial Commission, substantially amended the workers' compensation law, and made appropriations for the Bureau of Workers' Compensation and the new commission." *Voinovich* at 226. Indeed, according to one justice, the amended bill at issue in *Voinovich*

> transform[ed] the structure of the workers' compensation administration and delivery system. It limit[ed] the authority of the Industrial Commission and transfer[red] many of its powers to the Administrator of the Bureau of Workers' Compensation ("bureau"). It eliminate[d] the regional boards of reviews and revamp[ed] the entire hearing and appeals procedures.
>
> The bill limit[ed] the rights of injured workers to choose their own doctors, and change[d] the entire health care delivery system. It provide[d] incentives for prolonged employer resistance to determinations in favor of injured workers by requiring injured

workers to pay back awards that are reversed on appeal out of any subsequent claim payments.

The bill ma[de] numerous other major substantive changes to the workers' compensation system and to other areas of the law. These changes include[d] the privatization of the rehabilitation program and a definition of and standard of proof for intentional tort actions.

*Voinovich* at 252 (F.E. Sweeney, J., dissenting in part and concurring in part). We do not find that the magnitude of the changes to the bill in this case was any greater than the magnitude of the changes to the bill in *Voinovich*, and that precedent compels our decision here.

{¶ 22} Accordingly, we hold that the amended bill continued to relate to the creation of new methods for attempting to improve underperforming schools and thus that the amendments did not vitally alter H.B. 70, despite the addition of significant substantive language to the bill.

**B. Provision for City School Boards**

{¶ 23} The second proposition of law requires us to consider whether H.B. 70 violates the Ohio Constitution's provision for city school boards. That provision states:

Provision shall be made by law for the organization, administration and control of the public school system of the state supported by public funds: provided, that each school district embraced wholly or in part within any city shall have the power by referendum vote to determine for itself the number of members and the organization of the district board of education, and provision

shall be made by law for the exercise of this power by such school districts.

Article VI, Section 3, Ohio Constitution.

{¶ 24} We presume that legislative enactments are constitutional. R.C. 1.47(A). "A party asserting a facial challenge to a statute must prove beyond a reasonable doubt 'that no set of circumstances exists under which the act would be valid.' " *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Commt.*, 154 Ohio St.3d 86, 2018-Ohio-3220, 111 N.E.3d 1139, ¶ 26, quoting *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21. When considering a challenge under Article VI, Section 3 to legislation, we explained that "we must interpret the applicable constitutional provisions and acknowledge that 'a court has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislative branch of the government. When the validity of a statute is challenged on constitutional grounds, the sole function of the court is to determine whether it transcends the limits of legislative power.' " *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20, quoting *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.*, 139 Ohio St. 427, 438, 40 N.E.2d 913 (1942).

{¶ 25} We have previously held that Article VI, Sections 1, 2, and 3 of the Ohio Constitution grant the General Assembly "broad powers to provide a thorough and efficient system of common schools * * * and for the organization, administration, and control thereof." *State ex. rel. Core v. Green*, 160 Ohio St. 175, 115 N.E.2d 157 (1953), paragraph one of the syllabus. We recognized that "[t]he General Assembly has the power to provide for the creation of school districts, for changes and modifications thereof, and for the methods by which changes and modifications may be accomplished * * *." *Id.* at paragraph two of the syllabus.

We have also declared that "[b]oards of education have only such powers as are conferred by statute." *Marion Local Sch. Dist. Bd. of Edn. v. Marion Cty. Bd. of Edn.*, 167 Ohio St. 543, 545, 150 N.E.2d 407 (1958). We found that Article VI, Section 3 " 'does not give those [local] voters more power than the General Assembly to create policy and organize and administer a system of public education throughout the state.' " (Brackets sic.) *Ohio Congress of Parents & Teachers* at ¶ 46, quoting *State ex. rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.,* 10th Dist. Franklin No. 03AP-508, 2004-Ohio-4421, ¶ 39.

{¶ 26} According to the Youngstown School Board, H.B. 70 is unconstitutional "because it strips all power from city school boards that are subject to R.C. 3302.10."[2] The Youngstown School Board argues that the first clause of Article VI, Section 3 grants the General Assembly broad power in the area of public education but that the second clause reserves some of that power for city-school-district voters, who exercise their authority through city school boards.[3]

{¶ 27} We agree with the Youngstown School Board's observation that "Article VI, Section 3 grants a positive right to electors in city school districts to determine the number of members and organization of their boards of education," but we do not agree that the section also sets "a negative limit on the General Assembly's authority over city school districts." Indeed, in *Ohio Congress of Parents & Teachers*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 47, we stated that "Section 3, Article [VI] governs questions of size and organization, *not* the power and authority, of city school boards." (Emphasis

---

2. R.C. 3302.10 governs academic-distress commissions.

3. We do not make any holding related to the claim of amici curiae East Cleveland City School District Board of Education and Canton City School District Board of Education that R.C. 3302.11 is unconstitutional to the extent that it allows a mayor to appoint a new board of education after a school district has failed to meet certain standards for improvement. Because the Youngstown School Board did not raise this argument and the parties did not have an opportunity to litigate it, we do not evaluate it. *See State ex rel. Toledo Blade Co. v. Henry Cty. Court of Common Pleas*, 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, ¶ 19.

added.)  We have spoken in exceedingly broad terms about the General Assembly's authority over public education in the state, including affirming that "[a] board of education is 'a mere instrumentality of the state to accomplish its purpose in establishing and carrying forward a system of common schools throughout the state.' " *Id.*, quoting *Cincinnati Bd. of Edn. v. Volk*, 72 Ohio St. 469, 485, 74 N.E. 646 (1905).

{¶ 28} To be sure, we have affirmed legislation that substantially altered the power of electors and school boards.  In *Ohio Congress of Parents & Teachers*, we upheld a law setting up a charter-school system in this state, which undeniably took power from city school boards but did not usurp them.  And in *Core*, 160 Ohio St. 175, 180, 115 N.E.2d 157, we determined that the General Assembly has the power to create districts and move a territory from one district to another, thereby changing a school board's power as it does so.

{¶ 29} The General Assembly, therefore, may lawfully influence the authority of school boards in any manner of ways, large and small.  The limitation in Article VI, Section 3 on the General Assembly's power merely entitles electors to choose the number of members and the organization of the district board of education.

{¶ 30} The Youngstown School Board fairly describes H.B. 70 as allowing an academic-distress commission to remove nearly all the power and authority from a city school board and to place that authority in a chief executive officer under the circumstances contemplated by the law.  But Article VI, Section 3 does not prohibit this action, for the reason we recognized in *Ohio Congress of Parents & Teachers,* 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, at ¶ 47: the constitutional provision requires that a city's electors be able to decide the number of members of and the organization of a school board but does not require that any specific power or authority be vested in the school board.  Accordingly, to the extent that H.B. 70 allows a city's electorate to "determine for itself the number of members and the

organization of the district board of education," it does not violate Article VI, Section 3 of the Ohio Constitution.

### III. Conclusion

{¶ 31} For the foregoing reasons, we affirm the judgment of the court of appeals.

Judgment affirmed.

FISCHER, J., concurs.

KENNEDY, J., concurs in part and concurs in judgment only in part, with an opinion joined by DEWINE, J.

FRENCH, J., concurs, with an opinion.

DONNELLY, J., dissents, with an opinion.

STEWART, J., dissents, with an opinion.

_____

**KENNEDY, J., concurring in part and concurring in judgment only in part.**

{¶ 32} Because I agree with the majority that the enactment of 2015 Am.Sub.H.B. No. 70 ("H.B. 70") violates neither the three-consideration rule articulated in Article II, Section 15(C) of the Ohio Constitution nor the right of voters to decide the number of members and the organization of the district board of education as guaranteed by Article VI, Section 3, I join the judgment affirming the judgment of the Tenth District Court of Appeals. I disagree with the lead opinion's analysis regarding Article II, Section 15(C), however, because in my view, that provision is directory only and not enforceable in the courts. For this reason, I concur in judgment only with regard to that part of the lead opinion.

{¶ 33} Article II, Section 15(C) provides:

> Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house

in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house. No bill may be passed until the bill has been reproduced and distributed to members of the house in which it is pending and every amendment been made available upon a member's request.

{¶ 34} The requirement that a bill be considered on three separate occasions dates back to Ohio's 1802 Constitution. The provision was retained in the 1851 Constitution: "Every bill shall be fully and distinctly read, on three different days, unless, in case of urgency, three-fourths of the house, in which it shall be pending, shall dispense with this rule." Former Article II, Section 16, Ohio Constitution, effective from September 1, 1851, to November 3, 1903. Reviewing this language in 1854, this court described the "three-reading" rule as "directory" and enforceable only by the General Assembly, not the courts. *Miller v. State*, 3 Ohio St. 475, 484 (1854). The court distinguished the power of the General Assembly to enact a law from the mode by which it enacts a law. *Id*. at 482-483. The courts, we explained, are obligated to invalidate a statute that is repugnant to the Constitution and therefore beyond the power of the legislature to enact. *Id*. at 483. In contrast, we noted that "the constitution prescribes, or recognizes, certain things to be done in the enactment of laws, which things form a course, or mode, of legislative procedure," such as the three-reading rule. *Id*.

{¶ 35} We stated, "This is an important provision, without doubt; but, nevertheless, there is much reason for saying that it is merely directory in its character, and that its observance by the assembly is secured by their sense of duty and official oaths, and not by any supervisory power of the courts." *Id*. That is, any violation of the three-reading rule was not a basis for the courts to invalidate a statute.

**{¶ 36}** We reasoned in the alternative that even if the three-reading rule was not merely directory, the courts could not receive evidence that the rule had been violated, but rather "where the journals show that a bill was passed, and there is nothing in them to show that it was not read as the constitution requires, the presumption is, that it was so read, and this presumption is not liable to be rebutted by proof." *Id*. at 484. We presumed that members of the General Assembly comply with their oath to uphold the Constitution, concluding:

> True, the courts are made the judges in the last resort of the constitutionality of all laws; and, as before remarked, where a statute is on its face plainly unconstitutional, it is their duty so to declare it; but it does not necessarily follow that they are authorized to supervise every step of legislative action, and inquire into the regularity of all legislative proceedings that result in laws.

*Id*.

**{¶ 37}** We adhered to the holding that the three-reading rule is merely directory and not subject to judicial enforcement for more than a century. *See Hoover v. Franklin Cty. Bd. of Commrs.,* 19 Ohio St.3d 1, 4, 482 N.E.2d 575 (1985) (citing cases).

**{¶ 38}** In 1973, the people of Ohio amended the three-reading-rule language, creating the three-consideration rule now embodied in Article II, Section 15(C). The people acted on the recommendation of the Ohio Constitutional Revision Commission, which explained that "[t]he original reasons for the three reading rule appear to have been the absence of printing and the inability of some members of state legislatures to read and therefore become informed about matters on which they were obliged to vote." Ohio Constitutional Revision Commission, Recommendations for Amendments to the Ohio Constitution, Part I:

16

Administration, Organization, and Procedure of the General Assembly, at 43 (1971), https://www.lsc.ohio.gov/documents/reference/current/ohioconstrevision commrpt/recommendations%20pt1%20general%20assembly.pdf (accessed Apr. 2, 2020). [https://perma.cc/7ZLS-REWL]. The commission pointed out that those justifications for the three-reading rule no longer existed, but it nonetheless believed that "safeguards against hasty consideration of legislation" should be maintained. *Id.*

{¶ 39} For this reason, the commission chose to require a bill to receive three considerations. *Id.* The commission stated that the determination of what it means to "consider" a bill "will necessitate legislative interpretation," *id*. at 43, but noted that the legislature had previously had to "make a determination *by rule* as to the meaning of the constitutional rule [requiring three readings], (emphasis added)," *id*. And it lowered the number of votes required to dispense with the three-consideration rule from three-fourths to two-thirds of each house. *Id*. at 44.

{¶ 40} "As an added restriction upon undue haste and as an added element of assuring that legislators be familiar with measures that they are voting upon, the Commission incorporated a corollary to its proposed new three day rule" by barring passage of a bill until it has been reproduced and distributed to each member. *Id*. at 42. The commission rejected the approach of requiring the bill to be printed in its final form three days prior its passage and continued the common practice of allowing floor amendments—even large, substantive ones—without necessarily delaying a vote on the legislation. *Id*. at 43-44. Rather than restarting the process for passing a bill into law when an amendment had been made, including considering the amended bill three times, the commission determined that "adequate protection for the right to be informed would be afforded by revising the language in the form proposed, guaranteeing reproduction and distribution of all bills before passage and the availability of every amendment upon a member's request." *Id*. at 43.

**{¶ 41}** Lastly, as the court in *Hoover* noted, Section 15(C) was amended to include language that "every individual consideration of a bill * * * shall be recorded in the journal of the respective house." Based on the addition of the journalizing requirement, this court concluded in *Hoover* that the amendment not only made the three-consideration rule mandatory but also that it could now be enforced by the courts to invalidate statutes. The court reasoned that

> by constitutional mandate, there now exists an inherently reliable immediate source by which the legislature's compliance may be readily ascertained without any undue judicial interference. As a result of the new provision, there is no need to look anywhere but at the journals to determine whether the proper procedure has been followed.

*Id*. at 4. Because Section 15(C) required each consideration of a bill to be recorded and entered on the legislative journal, "the absence of entries to that effect renders the enactment invalid." *Id*. The court did not limit its review to the journal's statement that a bill had been considered three times, however; it also held that an amendment to the legislation could reset the requirement to consider the bill three times if it "vitally" altered the legislation and that that determination was subject to judicial review.

**{¶ 42}** However, nothing in the amended text of Article 15(C) indicates the intention of the people to abrogate over a century of case precedent holding that this court will not review the mode in which legislation was enacted.

**{¶ 43}** In its recommendation, the Ohio Constitutional Revision Commission expressly acknowledged our caselaw holding that the predecessor three-reading rule was directory, not mandatory, Ohio Constitutional Revision Commission at 44-45, and that the rule was "virtually never observed in Ohio," *id.*

at 42-43. It also addressed testimony submitted to the commission that "challenged the justification of retaining in the Constitution provisions which courts have termed 'directory only.' " *Id.* at 44. The commission stated that it had not rejected provisions such as the three-consideration rule, even though they had been labeled as directory, because "such rules are important as rules of proceeding *although the only safeguard against their violation is regard for an oath to support the Constitution.*" (Emphasis added.) *Id*. at 45. The commission understood that the violation of directory provisions such as the three-reading rule and the one-subject rule "has not invalidated legislation," *id*., but determined that these directory provisions should be retained anyway to "provide a minimal guarantee of a fair legislative process," *id.*, a guarantee enforced by the legislature itself.

{¶ 44} The court's determination in *Hoover* that the three-consideration rule is mandatory and that the courts may use it to invalidate legislation therefore runs counter to the express intent of the framers of the 1973 amendment. Instead, Section 15(C) leaves it up to the legislature, not the courts, to enforce the three-consideration rule.

{¶ 45} For these reasons, I would overrule *Hoover* and its progeny and restore the meaning of the Article II, Section 15(C) to what the people ratified in 1973—a directory provision safeguarded by the oath each member of the General Assembly takes to uphold the Constitution, including its rules of procedure. Because the lead opinion does not do so, I join its judgment but not its reasoning with regard to whether Article II, Section 15(C) of the Ohio Constitution is enforceable in the courts.

DEWINE, J., concurs in the foregoing opinion.

_____

**FRENCH, J., concurring.**

{¶ 46} I agree with the lead opinion that neither the challenged provisions of 2015 Am.Sub.H.B. No. 70 ("H.B. 70") nor the process by which they were

enacted violate the Ohio Constitution. I write separately, however, because I believe that it is time to overrule our flawed test in *Hoover v. Franklin Cty. Bd. of Commrs.*, 19 Ohio St.3d 1, 482 N.E.2d 575 (1985), for determining whether a legislative enactment violates the three-consideration rule in Article II, Section 15(C) of the Ohio Constitution. While I respect the principles of stare decisis, it is time to overrule *Hoover* because it was wrongly decided, it presents a rule that defies practical workability, and abandoning it would not create an undue hardship for those who have relied upon it. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus.

{¶ 47} The three-consideration rule states:

> Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house. No bill may be passed until the bill has been reproduced and distributed to members of the house in which it is pending and every amendment been made available upon a member's request.

Article II, Section 15(C) of the Ohio Constitution. In short, the rule requires each house of the General Assembly to consider every bill on three separate days before passing it and to record the dates of each consideration in its journal.

{¶ 48} In *Miller v. State*, 3 Ohio St. 475 (1854), this court first addressed the role of the judicial branch in enforcing the General Assembly's compliance with the three-consideration rule. The court understood its role to be a very limited one. At that time, the constitutional provision read: "Every bill shall be fully and

distinctly read, on three different days, unless, in case of urgency, three-fourths of the house in which it shall be pending, shall dispense with this rule." Former Article II, Section 16, Ohio Constitution, effective from September 1, 1851, to November 3, 1903. The *Miller* court construed the rule as "directory in its character" and concluded that "its observance by the assembly is secured by their sense of duty and official oaths, and not by any supervisory power of the courts." *Id.* at 483. The court's analysis started and ended with the legislative journals: "[W]here the journals show that a bill was passed, and there is nothing in them to show that it was not read as the constitution requires, the presumption is, that it was so read, and this presumption is not liable to be rebutted by proof." *Id.* at 484. Because the legislative journals indicated that the General Assembly considered the challenged bill on three separate days, the court declined to declare the statute unconstitutional on the ground that there were not three new readings of an amendment to the bill. *Id.* at 481-482.

{¶ 49} After *Miller*, the court continued to follow its holding that the three-consideration rule was directory in nature. *Lehman v. McBride*, 15 Ohio St. 573, 604 (1863). And the court relied on *Miller* to conclude that the one-subject rule, another constitutional provision governing legislative procedure, was also directory rather than mandatory. *Pim v. Nicholson*, 6 Ohio St. 176, 179-180 (1856).

{¶ 50} In 1973, Ohioans amended the three-consideration rule. That version, now the current iteration of the rule, introduced three changes. First, it replaced the phrase "shall be * * * read" with "shall be considered." Second, it changed the provision allowing each house to "dispense with" the rule to "suspend" the rule. And finally, it added a requirement that "every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house."

{¶ 51} None of these amendments suggested an intent to authorize greater judicial scrutiny of the legislative process. Yet, a decade later, this court ruled that

these amendments—specifically, the addition of a requirement that each consideration of the bill be recorded in the legislative journal—rendered *Miller* no longer controlling. *Hoover*, 19 Ohio St.3d at 4, 482 N.E.2d 575. The *Hoover* court construed this amendment as affording an opportunity for plaintiffs to offer extrinsic evidence that "the legislative journal does not reflect the requisite three considerations in each house of the bill in the form in which it was eventually enacted." *Id*. at 5. The legislative journals no longer provided conclusive proof of the General Assembly's compliance with the three-consideration rule. "Where it can be proven that the bill in question was not considered the required three times, the consequent enactment is void and without legal effect." *Id*. at 3.

{¶ 52} In this way, the *Hoover* court abandoned the holding of *Miller*. But it adopted dicta from *Miller* to conclude: "[A]mendments which do not vitally alter the substance of a bill do not trigger a requirement for three considerations anew of such amended bill. * * * But '[w]hen the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days * * *.' " *Hoover* at 5, quoting *Miller,* 3 Ohio St. at 482.

{¶ 53} The "vital alteration" language from *Hoover* has become the boilerplate test for determining whether a legislative enactment violates the three-consideration rule. *See State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 233, 631 N.E.2d 582 (1994) (a bill does not violate the three-consideration rule if "there is no indication that the subject matter of the original bill was 'vitally altered' such that there is no longer a common purpose or relationship between the original bill and the bill as amended" [emphasis deleted]). But neither *Hoover* nor our subsequent precedent provides any textual or historical reason why the addition of a recording requirement justifies heightened judicial scrutiny. *Hoover* was wrongly decided.

**{¶ 54}** *Hoover* has also become unworkable. Hoover's flawed analysis of the three-consideration rule has led to the "absurd and alarming consequences" that the *Miller* court tried to prevent—courts are being called upon to review every step of the legislative amendment process. *Miller*, 3 Ohio St. at 483. The dissent's lengthy recitation of the legislative maneuvering behind the enactment of H.B. 70 proves that point.

**{¶ 55}** With respect to the final element of *Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus, overruling *Hoover* would not create an undue hardship for those who have relied on it. Since *Hoover* was decided, we have discussed the three-consideration rule in only two cases, and we have not invalidated a legislative enactment on the basis that the rule was violated. *See Comtech Sys., Inc. v. Limbach,* 59 Ohio St.3d 96, 570 N.E.2d 1089 (1991); *Voinovich*. Overruling *Hoover* would not interfere with any substantial reliance interests.

**{¶ 56}** I would therefore overrule *Hoover* and abide by the text of the three-consideration rule. And the rule requires only that each house of the General Assembly consider every bill on three separate days and that each consideration be recorded in the journal of the respective house. Article II, Section 15(C) of the Ohio Constitution. The legislative journals reflect that each house of the General Assembly considered some version of H.B. 70 three times before its passage. Our inquiry ends there. Because the legislative record establishes the General Assembly's compliance with the three-consideration rule, I would conclude that the enactment of H.B. 70 did not violate Article II, Section 15(C) of the Ohio Constitution.

---

**DONNELLY, J., dissenting.**

**{¶ 57}** Article II, Section 15(C) of the Ohio Constitution declares that "[e]very bill shall be considered by each house on three different days * * *."

Today, a majority of the court discards the three-consideration rule set forth in the Constitution and accepts in its place the far less bothersome rule of one-and-done. In an egregious display of constitutional grade inflation, the majority gives passing marks to an act that was not considered three times by either house.

{¶ 58} Indeed, this is more like a tale of two bills. One bill, as introduced in the Ohio House of Representatives, authorized local school districts to establish community learning centers as an additional local resource. That bill received due consideration by both houses of the legislature. The other bill, offered at the 11th hour, provided for a state takeover process aimed at underperforming public schools throughout Ohio. Those material alterations, which were bootstrapped to the original bill, were considered once by the Senate on June 24, 2015, and, through political muscle and partisan control, were thereafter passed by the Senate and concurred to by the House *that same day*. By any fair measure, the amendments added by the Senate at the 11th hour did not receive the requisite three considerations in either house.

{¶ 59} In my view, the enactment of Am.Sub.H.B. No. 70 woefully fails to meet the letter or the spirit of the three-consideration rule. Yet, regrettably, in its willful disregard of the facts and superficial treatment of precedent, a majority of the court hands out a passing grade. Because I believe that facts and precedent dictate that the 2015 enactment of Am.Sub.H.B. No. 70 is unconstitutional, I vehemently dissent.[4]

### The Three-Consideration Rule and Precedent

{¶ 60} Article II, Section 15(C) of the Ohio Constitution, states:

> Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house

---

4. This dissent offers no opinion on the majority's analysis on the second proposition of law.

in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house. No bill may be passed until the bill has been reproduced and distributed to members of the house in which it is pending and every amendment been made available upon a member's request.

{¶ 61} "[T]he three-consideration language of Section 15(C), Article II is no longer directory but is instead mandatory." *State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 232, 631 N.E.2d 582 (1994).

{¶ 62} In *Hoover v. Franklin Cty. Bd. of Commrs.*, 19 Ohio St.3d 1, 482 N.E.2d 575 (1985), a taxpayer claimed that a bill by which R.C. 140.051 was enacted violated the Constitution's three-consideration rule. The bill, as introduced in the Senate, pertained to criminal nonsupport. With minor amendments, it received three hearings and was passed in the Senate. *See id*. at 5. After it was sent to the House, a committee reported back to the House a substitute bill that was completely different in content. The substitute bill concerned the financing, acquisition, and construction of hospital and healthcare facilities for the use of nonprofit entities. *See id*. Prior to its third consideration in the House, the substitute bill was amended to provide for the Ohio licensure of Canadian physicians without examination. *See id*. We held, however, that the plaintiff would be entitled to relief if he could prove the facts alleged in his complaint, that is, that the bill was enacted without the required three considerations in each house:

Therefore, plaintiff must be afforded an opportunity to demonstrate if he can that the legislative journal does not reflect the requisite three considerations in each house of the bill in the form in which it was eventually enacted. * * * [A]mendments which do not vitally

alter the substance of a bill do not trigger a requirement for three considerations anew of such amended bill. *Miller* [*v. State*, 3 Ohio St. 475, 482 (1854)]. But, "[w]hen the subject or proposition of the bill is thereby wholly changed, it would seem to be proper to read the amended bill three times, and on different days * * *." *Id*.

*Hoover* at 5.

{¶ 63} In *Voinovich*, the court rejected a three-consideration challenge to Am.Sub.H.B. No. 107, 145 Ohio Laws, Part II, 2990. That bill was introduced as a 4-page bill to appropriate money to the Bureau of Workers' Compensation, but 20 pages of amendments were added that structurally changed the Bureau of Workers' Compensation and the Industrial Commission and amended the procedural and substantive law underlying the compensation of injured workers.[5] Indicating that a "vitally altered" bill is one "departing entirely from a consistent theme," the lead opinion there, seemingly borrowing analytically distinct precepts used in one-subject rule analysis, Article II, Section 15(D) of the Ohio Constitution, stated:

> We therefore hold that a legislative Act is valid if the requisite entries are made in the legislative journals and there is no indication that the *subject matter of the original bill was "vitally altered"* such that there is no longer a common purpose or relationship between the original bill and the bill as amended.

---

5. Provisions relating to an intentional tort and child-labor exemptions were found to violate the one-subject rule under Article II, Section 15(D) of the Ohio Constitution and were severed from the act. *Voinovich* at 230.

(Emphasis sic.) *Id*. at 233.[6] Acknowledging that the bill had been "substantially amended at every step in the proceedings," *id.,* the court stated:

> The difference between a valid bill that is heavily amended, however, and an invalid one that is "vitally altered," * * * is one of degree. Section 15(A), Article II of the Ohio Constitution reserves to each house the right to freely alter, amend or reject bills introduced by either. This court would be setting dangerous and impracticable precedent if it undertook a duty to police any such difference of degree.
>
> Instead, we must look to the underlying purpose of the three-consideration provision. As articulated by Justice Douglas in his concurring opinion in *Hoover*, "the purpose of the 'three reading' rule is to prevent hasty action and to lessen the danger of ill-advised amendment at the last moment. The rule provides time for more publicity and greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with his

---

6. Given that all seven justices wrote separate opinions in *Voinovich*, it is not immediately apparent that the lead opinion, signed only by Justice Wright, necessarily represents a majority opinion. Two justices concurred, agreeing that the three-consideration requirement had been satisfied. *Id*. at 245 (Douglas, J., concurring); *id*. 247 (Resnick, J., concurring). A fourth justice said simply that the majority had "effectively and pragmatically" resolved the legitimate constitutional issues presented. *Id*. at 247 (Pfeifer, J., concurring). While dissenting from the majority's decision to sever the employment-intentional-tort and child-exemption provisions, the chief justice otherwise concurred in the majority opinion. *Id*. at 248-249 (Moyer, C.J., concurring in part and dissenting in part). A sixth justice agreed that the employment-intentional-tort and child-exemption provisions violated the one-subject rule, but also believed that the entire act violated the one-subject rule, and expressed no opinion on the three-consideration issue. *Id*. at 249-250 (A.W. Sweeney, J., concurring in part and dissenting in part). A seventh justice concurred in the court's decision to grant a writ of mandamus to compel the relator's salary increase, but dissented from the other dispositions and specifically dissented from the court's three-consideration disposition. *Id*. at 251-255 (F.E. Sweeney, J., concurring in part and dissenting in part). Despite the lack of express assent to the lead opinion's discussion of the three-consideration rule, I will nevertheless assume for purposes of this discussion that that opinion's discussion of the three-consideration rule garnered the unexpressed assent of a court majority if only by silent implication.

or her constituents, note the comments of the press and become
sensitive to public opinion."

(Footnote omitted.) *Voinovich* at 233-234, quoting *Hoover*, 19 Ohio St.3d at 8, 482
N.E.2d 582 (Douglas, J., concurring).

{¶ 64} In contrast with *Hoover,* in which the entire contents of the original
bill had been removed and replaced by a totally unrelated subject, *Voinovich*
addressed a bill that had been heavily amended and yet retained its common
purpose to modify workers' compensation laws. *Id.* at 234.

Furthermore, both houses deliberated upon Am.Sub.H.B. No. 107
and its amendments for several months. Hearings were held and the
issues were openly debated. The Governor stimulated the debate by
announcing in the press that he would veto any appropriations bill
that did not also substantially reform the underlying worker's
compensation system. It would be difficult to characterize this
activity as "hasty action" that precipitated "ill-advised amendment
at the last moment."

*Id.*

{¶ 65} For the reasons that follow, however, I believe that the lead opinion's superficial treatment of the underlying facts and applicable law fails fundamentally to honor the three-consideration rule or do justice in this case.[7]

**Background**

{¶ 66} The original bill, H.B. No. 70, was several years in the making. After nearly four years of careful study and work, it had been introduced as H.B. No. 460 during the 130th General Assembly. Although it had made its way through the House and reached the Senate during the previous biennial, there had not been sufficient time for it to pass. However, because of its wide bipartisan support, the bill's primary sponsors reintroduced it in the 131st General Assembly. Thus, Representative Denise Driehaus, one of its primary sponsors, reintroduced H.B. No. 460, now known as H.B. No. 70, in the House on February 18, 2015.

{¶ 67} Representative Driehaus's ten-page bill, referred to as the Community Learning Centers Process, was a permissive bill that sought to expand opportunities for local school districts, working in collaboration with teachers, parents, and the community, to create community learning centers. The bill defined "community learning center" as a school that "participates in a coordinated, community-based effort with community partners to provide comprehensive educational, developmental, family, and health services to students, families, and community members during school hours and hours in which school is not in session." The bill proposed the enactment of three new sections of the Revised Code: R.C. 3302.16, 3302.17, and 3302.18.

---

7. The lead opinion calls my recitation of the facts in this opinion superfluous, asserting that it is not this court's role to police how the amended language came into existence. But I believe that legal issues do not arrive at the court in a vacuum. Facts always play an integral part in our analysis and must be included to allow a reader to understand the legal issues we decide. But for this dissent, the public would be left with the perfunctory and sanitized rendition of the facts outlined in the lead opinion. Instead, I believe that inclusion of the facts surrounding the amendment of H.B. No. 70 serves to shine a necessary spotlight on the General Assembly's failure to follow the dictates of the Ohio Constitution. Let the people decide whether, based on these facts, we have failed them in our role as guardians of the constitutional system of checks and balances.

{¶ 68} H.B. No. 70 was considered for a second time in the House on February 25 and sent to committee. On May 19, the bill was considered for the third time and passed in the House.

{¶ 69} The next day, H.B. No. 70 was considered for the first time in the Senate. It was considered a second time on May 27 and sent to committee. Although H.B. No. 70 picked up more co-sponsors, the language of the bill remained unaltered from its original introduction.

{¶ 70} In the meantime, and unbeknownst to the primary sponsors, state actors such as Governor Kasich's staff, Dr. Ross, the superintendent of public education, and his staff were busily and covertly crafting a plan to restructure the current academic-distress-commission law that would affect the Youngstown City School District, which was currently under academic-distress-commission control.

{¶ 71} In September 2014, Thomas Humphries, president of the Youngstown/Warren Regional Chamber of Commerce, talked with representatives from the governor's office and the Ohio Department of Education. After the meeting, Humphries assembled a small cabinet that included local business people. Although the cabinet had the aspirational goal of reaching out to various community leaders to produce a plan that would improve the Youngstown City School District, no public announcement was made about the cabinet, and some people who expressed interest in helping improve the schools were not asked to join the cabinet or allowed to provide input. In fact, the cabinet never considered any recommendations from the community or drafted its own plan. The cabinet members met in secrecy, and their identities were not made known until after the legislation had passed.

{¶ 72} Instead, despite its mission of developing a plan that would be owned by the community, the cabinet merely served as the conduit for the governor and Department of Education's scheme to take over the Youngstown City School

District. Much like a drug-dealer's "mule," the cabinet would unwittingly provide innocent cover for the state bandits.

{¶ 73} The cabinet first learned of the state's scheme in February 2015 when Buddy Harris, a Department of Education senior policy analyst, attended the cabinet meeting and shared that the state was formulating a plan and the cabinet should be prepared to implement it. Harris attended another cabinet meeting, held on April 28, and offered more details of the state's plan.

{¶ 74} In May, Dr. Ross, Harris, and another Department of Education analyst met with the cabinet to educate it on the particulars of the state plan and to keep the group up-to-date as to what was going to take place over the next few weeks. At the start of the meeting, Dr. Ross reminded the cabinet to keep the plan confidential. Dr. Ross then turned the meeting over to the senior policy analysts to explain the plan that would soon be added to H.B. No. 70. Dr. Ross reiterated the importance of maintaining secrecy at the conclusion of the meeting.

{¶ 75} The plan, which was presented to the cabinet by state officials at secret meetings, was referred to as the "Academic Distress Commission Reform Proposal." The state's calculated design was to attach the 66-page proposal to H.B. No. 70 on the last day of the legislative session, June 24.

{¶ 76} Humphries, working in conjunction with the governor's staff, created a call schedule that contained names of legislators to contact as well as dates on which those legislators should be called. Calls would begin once Humphries received approval from state officials. To counteract negative public feedback, talking points were prepared by state operatives and circulated to the cabinet members. Calls were made to some Republican legislators from June 19 through June 22. On June 23, a lobbyist was notified and the Democrat minority leader and a Republican primary sponsor of H.B. No. 70 were to be notified of the amendment. On the morning of June 24, the primary Democrat sponsor, Representative

Driehaus, other Youngstown area Democrat representatives, and key Republican representatives were to be notified of the amendment.

{¶ 77} Although Representative Driehaus, the bill's primary sponsor, was not supposed to be contacted until the morning of June 24, she received a call from the governor's office on June 23 asking her to meet. She was not told the purpose of the meeting, and her aide's attempt to discover that information was unsuccessful. At the meeting, Representative Driehaus learned that an amendment to her bill would be offered in the Senate. Despite the requirement in Article II, Section 15(C) of the Constitution that every amendment shall be "made available upon a member's request," she was not provided with a copy of the amendment. Representative Driehaus later stated before the House that she strongly opposed the amendment and argued that her bill was being "turned on its head."

{¶ 78} By happenstance, Senator Schiavoni, who represented the Senate district that includes the Youngstown City School District, also learned of the amendment on June 23. According to Senator Schiavoni, he was in Youngstown on June 23 when he heard rumblings that legislation that would affect the Youngstown City School District was to be submitted. That information was confirmed when he received a call from the governor's office that evening. He was told that the Senate Education Committee was going to vote on a bill the next morning that would affect the school district and that the bill would then be sent directly to the floor for a vote.

{¶ 79} Senator Schiavoni promptly began to drive to Columbus. On the way, he called Senator Lehner and demanded to meet with her that evening. When Senator Schiavoni arrived in Columbus around 10:30 p.m., he met with Senator Lehner. Senator Schiavoni's aide had been able to obtain an electronic copy of the amendment, and it was that copy, which had been downloaded to his cell phone, that he had when he met with Senator Lehner.

{¶ 80} Senator Schiavoni asked for more time to understand the legislation and get public input on it. He testified at the preliminary-injunction hearing that he was told multiple times that "the Governor wanted this [legislation passed] the next day which was the last day of the session."

{¶ 81} The Senate Education Committee held a hearing on H.B. No. 70 on June 24. Melissa Cropper, then president of the Ohio Federation of Teachers, who had previously been scheduled to testify in favor of H.B. No. 70, rose to speak. Cropper had learned of the coming amendment and tried to speak against it. But Senator Lehner denied Cropper that opportunity because the amended version had not been introduced yet. As soon as Cropper returned to her seat, the amended version was introduced. After the hearing, Am.Sub.H.B. No. 70 was reported out of committee that day and sent to the full Senate.

{¶ 82} Am.Sub.H.B. No. 70, as reported out of the Senate committee, sought to enact or amend 15 sections of the Revised Code. The Senate amendment left the language creating community learning centers undisturbed. But the Senate version added provisions to repeal former R.C. 3302.10, which had created academic-distress commissions vastly different from the ones created in the new bill, and amounted to a state takeover of any affected local school district.

{¶ 83} R.C. 3302.10, as enacted in Am.Sub.H.B. No. 70, requires that the state superintendent of public instruction establish a five-member academic-distress commission (comprised of three members appointed by the state superintendent, a district teacher appointed by the president of the school board, and a member appointed by the mayor of the area where the school district is located) for any school district that either received an overall grade of "F" on the school report card delivered by the Department of Education for three consecutive years or had an academic-distress commission that was in existence on the effective date of the bill and in existence for at least four years. The commission is required to appoint a chief executive officer ("CEO"), defined as an individual having high-

level-management experience in either the public or private sector. R.C. 3302.10(C)(1). The CEO, who serves at the pleasure of the commission and is paid by the Department of Education, has complete operational, managerial, and instructional control over the district. *Id.* Thus, the CEO's powers effectively replaced the duties and responsibilities of the locally elected school board and the school superintendent. *See* R.C. 3302.10(C)(1)(a) through (q).

{¶ 84} The amendment to H.B. No. 70 increased offers for vouchers to charter schools for any family regardless of income, incentivized payments to schools outside the district, and gave the CEO essentially unfettered discretion to reconstitute public schools into charter schools. In reconstituting a school, the CEO can replace school staff, contract with a nonprofit or for-profit entity to manage and staff the school, change the focus of the school's curriculum, reopen negotiations for existing collective-bargaining contracts, and permanently close a school. R.C. 3302.10(H)(1). And finally, what Senator Schiavoni later described as "the icing on the cake," R.C. 3302.10(O) states that if no students remain in the district, the commission shall be dismantled and the CEO shall cease to exercise any powers.

{¶ 85} Several lawmakers rose on the House floor to speak against the Senate's amendment. Representative Driehaus stated:

REPRESENTATIVE DRIEHAUS: This is House Bill 70, as passed by the house. This is House Bill 70. I love this bill. This is a transformational bill. People have turned their lives around in Cincinnati because of this model. This is our bill. Most of you voted for this bill, a whole bunch of you put your name on it. It's a good bill. I've been working on this bill for four years.

Some of you have come down to Cincinnati, some of you have come to Oyler. I've heard nothing but rave reviews about

Oyler and the model, and I thank you for coming. It meant a lot over the four-year period.

About 24 hours ago, though, I was asked to meet with the Ohio Department of Education. I didn't know why we were meeting. I even asked my aide, call them, what are we meeting—is it the budget? Is it the community learning—what is it? What are we meeting about? I would like to be prepared.

I couldn't get that information about what the meeting was about.

So I went to the meeting, and they told me they're going to offer an amendment to House Bill 70 over on the Senate side. I said okay. What's the purpose of the amendment? Could I get the language of the amendment?

What's the hurry on the amendment and why my bill? What are we doing—we've got a budget rolling through right now. We've got other bills rolling through right now. Really? I don't know anything about this. Why House Bill 70? I got incomplete answers to all of those questions.

So it turns out that this amendment is the antithesis of House Bill 70. House Bill 70 is about a groundswell of support for something in a community where you engage the community, the parents, the teachers, the community at large. That's what—that's what the model is all about. Without that, there is no model. It's about community engagement; it's about collaboration. The amendment turns the bill on its head.

The amendment is about Youngstown and every other community that's going to go into academic distress, by the way.

This isn't just Youngstown. This will come to any community that has this distress commission. So this is a statewide policy.

And it talks about a process where a CEO is put in place, hired by five people, three of whom are chosen by somebody here in Columbus, and that person has ultimate authority over the school district.

Eventually, according to this amendment, from my read, the entire school district could be dismantled under this amendment by way of the CEO. And I am not exaggerating. That's what the language says. And it's a top down approach to schools, to school districts. That is not what House Bill 70's about. It's the opposite of what House Bill 70's about.

So we need to address the issues in Youngstown. I agree. I don't know that much about the distress commission nor do I know that much about the trials and tribulations over the last four years in Youngstown. We need to address what's going on in Youngstown, I agree. Let's work on it. Let's take our time. Let's do it together. Let's create some good policy. Let's do our work. We did our work; we did our due diligence. We engaged interested parties. We worked in a bipartisan way all the way through this bill. I've been working on this bill for four years. In 24 hours the administration blew it up.

I do not agree with the administration's changes to my bill, and I ask you to join me in nonconcurrence with the Senate changes.

{¶ 86} Representative Lepore-Hagan of Youngstown also rose on the House floor to speak against concurring in the Senate's amendment:

REPRESENTATIVE LEPORE-HAGAN: I rise in opposition to this bill in this current form. While I still believe in its original intentions of House Bill 70, I cannot in good conscience support a bill with this amendment attached to it.

What started out as an organic community based plan for our children's futures has really been turned on its head and perverted by a fast track, heavy handed takeover of Youngstown city schools. The total loss of the citizens' right of local control. I have concerns about the process and the content of this amendment and how it was rushed through at the last minute with no involvement from the legislative delegation or the community.

We spent six months discussing the Cleveland plan, four months discussing the Columbus plan, and now here we stand given less than 24 hours to review a 66-page amendment that had one brief public hearing this morning. This is now the major policy for education? This is the change.

At the 11th hour, we're asked to consider an amendment to a bill that received wide bipartisan support when it left the chamber. This amendment was not vetted in the house because we had no hearings on the amendment and yet we are expected to concur.

Members had three years to consider the community learning center models and many in this chamber visited the Cincinnati schools to see first-hand how the wraparound services can change the lives of a community, its students and * * * school, and it's an overwhelming success and the development from the ground up opposite of the language that is in the amendment.

We need to respect the fact that education decisions should be made in consultation with parents, the teachers, regional

lawmakers, business leaders, local and elected officials. And in the coming weeks, I intend to continue to hold my meeting with community leaders in Youngstown to discuss implementing a community learning center in Youngstown.

But today this fast track creates a slippery slope that ends up being a slow transition to a dissolution of a school district, forcing Youngstown city school kids to failed charter schools. Our kids in Youngstown deserve a more deliberate and thorough process for a plan that enables them to succeed, not a plan that plans on their failures.

\* \* \*

I urge a no vote, Mr. Speaker, on the concurrence of the Senate amendment.

{¶ 87} Another member of the House, Representative Phillips, tellingly asks: "I'm reading the synopsis of Senate amendments, and obviously we don't have the actual language of the amendments before us, and there are a couple provisions in here that seem very sweeping to me and somewhat different from what you stated previously, specifically how widespread this might be."

{¶ 88} Until 2018, two school districts with preexisting academic-distress commissions were Youngtown and Lorain City Schools, according to amicus curiae East Cleveland City School District Board of Education. Since H.B. No. 70 was enacted over four years ago, all lower performing school districts in the state are potentially subject to the takeover provisions. In September 2018, Canton became one of the 14 public-school districts in the state subject to takeover pursuant to Am.Sub.H.B. No. 70. Amicus curiae Canton City School District asserts that the other city school districts subject to Am.Sub.H.B. No. 70 are Ashtabula,

Cleveland Municipal, Columbus, Dayton, East Cleveland, Euclid, Lima, Mansfield, North College Hill, Painesville, and Toledo.

**Violation of the Three-Consideration Rule**

{¶ 89} On this record, it is demonstrably untenable to say that Am.Sub.H.B. No. 70 received the requisite three considerations by both houses of the General Assembly.

{¶ 90} When H.B. No. 70 was introduced in the House, its purpose was to authorize a board of education to develop community learning centers. The House had no reason to give any consideration to a clandestine academic-distress-commission takeover initiative. After it was considered three times, H.B. No. 70 passed without amendment.

{¶ 91} When H.B. No. 70 was introduced and then considered on two separate days by the Senate, it still addressed only community learning centers. The Senate had no reason to give any consideration at that point to a clandestine academic-distress-commission takeover initiative.

{¶ 92} But the Senate amendment to H.B. No. 70 introduced extensive and radically new concepts of school-district governance that did not relate to or follow logically from the theme of H.B. No. 70 as introduced. The purpose of the amendment was to allow the state to unilaterally remove local control by replacing a board of education with an appointed, not elected, academic-distress commission and by placing the school district under the control of a CEO, who could ultimately decide to completely dismantle the public-school district and replace it with for-profit charter schools. Instead of enhancing a local school board's ability to provide services for students and families in underperforming districts, Am.Sub.H.B. No. 70 strips away all local control. By prior calculation and design, the stealth takeover did not emerge until just prior to the third consideration in the Senate, immediately prior to its passage in the Senate and immediate transmission to the House, where it passed on a party-line vote on the last day of the legislative session.

**{¶ 93}** It is one thing to amend a bill with language that has been debated and considered by the legislative authority. It is quite another thing to add an entire stand-alone bill that proposes major public-school reform. Like a thief in the night, Am.Sub.H.B. No. 70 appeared without warning to unsuspecting lawmakers and the public they serve, and with no opportunity for reflection, public discourse, or debate, slipped away untouched with the complete power to displace local public control of Ohio public school districts. Under no circumstances can it be fairly said that Am.Sub.H.B. No. 70 received three considerations in each house.

**{¶ 94}** Relying on *Voinovich*, the lead opinion here is content to accept the state's blithe assertion that H.B. No. 70 as originally introduced "had the same common purpose as the bill that was eventually passed: improving education in underperforming school districts." Lead opinion at ¶ 17.[8] But neither *Voinovich* nor *Hoover* stand for the proposition that courts should close their eyes to vital substantive alterations that have not been considered three times before a final vote is held.

**{¶ 95}** Indeed, suppose that just prior to the third consideration of H.B. No. 70 in the Senate, the Senate proposed an amendment that completely removed the community-learning-center provisions but contained all the academic-district-commission provisions. Could anyone seriously contend that those academic-

---

8. The purpose of H.B. No. 70, as considered by the House, was to allow community learning centers as an additional resource for local school districts. But the amendment added by the Senate on June 24 created financial incentives for academic-distress commissions to transfer students from public schools to for-profit charter schools and thus to ultimately close local public schools. It is, to be charitable, Orwellian doublespeak to say that they had a common purpose of improving education in underperforming districts. But then again, this court has concluded that the system of funding public schools in Ohio violates the Thorough and Efficient Clause of the Ohio Constitution. Article VI, Section 2, Ohio Constitution. *See DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733 (1997); *DeRolph v. State*, 89 Ohio St.3d 1, 728 N.E.2d 993 (2000); *DeRolph v. State*, 93 Ohio St.3d 309, 754 N.E.2d 1184 (2001), *vacated on reconsideration*, 97 Ohio St.3d 434, 2002-Ohio-6750, 780 N.E.2d 529. Exacerbating that constitutional disparity, the true purpose of H.B. No. 70 as ultimately passed would appear to be: If you can't fund them, eliminate them.

distress-commission provisions, even if offered for the purpose of "improving education in underperforming school districts," had received three considerations in the House and the Senate? Of course not! It would have been a completely different piece of legislation. I fail to see how the last-minute attempt to piggyback on the duly considered community-learning-center legislation can give the academic-district-commission legislation even a fig leaf of cover to mask the utter failure to comply with the letter or spirit of Article II, Section 15(C) of the Constitution.

**{¶ 96}** If some conditions existed to necessitate immediate passage without three considerations, Article II, Section 15(C) itself provides a mechanism: a vote to suspend the requirement that is recorded in the journal of each house. That did not occur here. There was no emergency warranting suspension of the three-consideration rule. There was only a calculated scheme to circumvent that constitutional obligation at the 11th hour.

**{¶ 97}** More than happy to avoid any meaningful analysis of the "difference of degree," *Voinovich*, 69 Ohio St.3d at 233, 631 N.E.2d 582, between the bill as introduced and the bill as enacted and all but ignoring "the underlying purpose of the three-consideration provision," *id.*, the lead opinion here can only express its sympathy to the Youngstown School Board. *See* lead opinion at ¶ 19. But *Voinovich* itself shows how egregiously the passage of Am.Sub.H.B. No. 70 desecrates the underlying purpose of the three-consideration rule.

**{¶ 98}** After the original workers' compensation legislation at issue in *Voinovich* was amended, it was sent to a conference committee. Both houses deliberated and then passed the bill as it was reported out by the conference committee. This process took over five months. The legislators had time to conduct hearings and openly debate the issues. Moreover, the governor stimulated the debate by announcing in the press that he would veto any appropriations bill that did not also substantially reform the workers' compensation system.

{¶ 99} In stark contrast, the *only* amendment to H.B. No. 70 occurred just prior to its third consideration in the Senate, when the 10-page community-learning-centers bill ballooned by operation of Am.Sub.H.B. No. 70 into a 77-page academic-distress-commission state-takeover bill. The Senate then considered and immediately passed the bill, sending it that same day to the House, where it was rushed to a vote and passed on party lines over strenuous objections, all within a span of approximately 12 hours.

{¶ 100} There were no hearings on the amendment. There was no public debate on the amendment. Far from stimulating open discussion about his plans, the governor and the staff of the Department of Education operated in complete secrecy in order to conceal the state-written takeover plan. There was no announcement to the press. The legislators had no opportunity to study the proposed legislation, much less communicate with their constituents to determine their reactions to the proposed amendment. This is precisely the kind of "hasty action" taken "at the last moment," *Voinovich,* 69 Ohio St.3d 233, 631 N.E.2d 582, that the three-consideration rule should guard against.

{¶ 101} I am sorely distressed that this court has missed the opportunity to uphold fundamental principles of the Ohio Constitution—principles that must not be swept aside in a rush to pass hasty legislation. The wise framers of the Constitution carefully fashioned checks and balances that are a cornerstone to our democratic system and that provide for good governance. *Buckeye Community Hope Found. v. Cuyahoga Falls*, 82 Ohio St.3d 539, 547, 697 N.E.2d 181 (1998) (Stratton, J., concurring). The intent of the framers of the Constitution should guide this court. *Hockett v. State Liquor Licensing Bd.,* 91 Ohio St. 176, 179-180, 110 N.E. 485 (1915).

{¶ 102} Here, the history of the Constitution shows that the language was amended in 1973 to change the requirement from "[e]very bill shall be fully and distinctly read on three different days * * *" to "[e]very bill shall be considered by

each house on three different days * * *." They rejected proposals to eliminate the three-reading rule from the Constitution and leave it to legislative rule. The drafters understood the three-consideration rule to be a safeguard against hasty action and the courts are the means to enforce that safeguard. Ohio Constitutional Revision Commission, Recommendations for Amendments to the Ohio Constitution, Part I, 43 (December 31, 1971). https://www.lsc.ohio.gov/documents/reference/current/ohioconstrevisioncommrpt/recommendations%20pt1%20general%20assembly.pdf *(accessed Mar. 5, 2020) [https://perma.cc/V3RJ-RL8T]*.

{¶ 103} The General Assembly's failure to comply with the mandated provisions of the three-consideration rule in Article II, Section 15(C) of the Ohio Constitution renders the legislation at issue unconstitutional and invalid.

{¶ 104} While no one disputes that improving failing public schools is an important cause, the ends do not justify the means. This court can respect the powers of the General Assembly without relinquishing its duty to enforce the Constitution. *Capital Care Network of Toledo v. Ohio Dept. of Health*, 153 Ohio St.3d 362, 2018-Ohio-440, 106 N.E.3d 1209, ¶ 75 (O'Connor, C.J., dissenting). "When the people use their power to place specific restraints on government, this court has a responsibility to honor and enforce that decision." *Id.* at ¶ 66 (O'Connor, C.J., dissenting). Justice may be blind, but it should not be because we have willfully blinded ourselves to injustice.

### Conclusion

{¶ 105} Today's decision sets a new low for constitutional compliance with Article II, Section 15(C) of the Ohio Constitution. For all the talk about academic distress, it is sadly our constitutional form of government that is in distress by this decision. The state legislature could honor our Constitution simply by applying its legislative requirements *as they are written*. It failed. Likewise, this court could honor our Constitution simply by applying its terms *as they are written*. It too has failed. I cannot and will not join in this travesty of justice. I dissent.

———————

**STEWART, J., dissenting.**

{¶ 106} A majority of this court has decided that the amendments made to 2015 Am.Sub.H.B. No. 70 ("H.B. 70") during its consideration by the General Assembly do not violate the requirement in the Ohio Constitution that a bill must be considered by each house of the General Assembly on three separate days. This decision is a complete abdication of this court's responsibility as the guardian of the Constitution.

{¶ 107} Article II, Section 15(C) of the Ohio Constitution states, "Every bill shall be considered by each house on three different days, unless two-thirds of the members elected to the house in which it is pending suspend this requirement, and every individual consideration of a bill or action suspending the requirement shall be recorded in the journal of the respective house."

{¶ 108} "The usual explanation for Delay Rules like the three-reading rule is that [the legislative body] wants to constrain itself from acting out of temporary passion, and that the costs of bad legislation caused by passion are greater than the benefits that are lost as a result of the constraint on quick action." Gersen & Posner, *Timing Rules and Legal Institutions*, 121 Harv.L.Rev. 543, 565 (2007). In addition, the three-consideration clause "provides time for more publicity and greater discussion and affords each legislator an opportunity to study the proposed legislation, communicate with his or her constituents, note the comments of the press and become sensitive to public opinion." *Hoover v. Franklin Cty. Bd. of Commrs.*, 19 Ohio St.3d 1, 8, 482 N.E.2d 575 (1985) (Douglas, J., concurring). *See also Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (Jackson, J., concurring) ("The Rules of the House and Senate, with the sanction of the Constitution, require three readings of an Act in each House before final enactment. That is intended, I take it, to make sure that

each House *knows what it is passing* and passes what it wants, and that what is enacted was formally reduced to writing" [emphasis added]).

{¶ 109} Article II, Section 15(C) contains both a substantive and a procedural component. The procedural component requires that every individual consideration of a bill be recorded in the journal of the respective house; the substantive component requires that a bill that is vitally altered by amendments be considered by each house on three separate days, *Hoover* at 5. Amendments vitally alter a bill when "there is no longer a common purpose or relationship between the original bill and the bill as amended." *State ex rel. Ohio AFL-CIO v. Voinovich*, 69 Ohio St.3d 225, 233, 631 N.E.2d 582 (1994).

{¶ 110} The original title of H.B. 70, as introduced, stated that the bill's purpose was to "enact sections 3302.16, 3302.17, and 3302.18 of the Revised Code to authorize school districts and community schools to initiate a community learning center process to assist and guide school restructuring." A bill's title is important. First, the subject of a bill is to be clearly expressed in its title. Article II, Section 15(D) of the Ohio Constitution. Second, the purpose of expressing the object of the legislation in the title of a bill is "to defeat deceitful, mysterious and misleading titles which foster the practices of entrapping the Legislature into the passage of provisions in the bill unrelated to and not intimated by the title of the bill, and also of misleading the people as to the contents of proposed statutes." Manson, *The Drafting of Statute Titles*, 10 Ind.L.J. 155, 156 (1934). Thus, when the legislature titles a statute, it "determines for itself the desired scope of the statute, and defines the object and the scope of the statute in the title of the act with such particularity of definition as it deems best." *Id*. at 161.

{¶ 111} When the Ohio Senate amended H.B. 70, it changed the title to the following:

A BILL To amend sections 133.06, 3302.01, 3302.036, 3302.04, 3310.02, 3310.03, 3310.032, 3310.035, 3311.29, and 3314.102; to enact new section 3302.10 and sections 3302.11, 3302.16, 3302.17, and 3302.18; and to repeal section 3302.10 of the Revised Code to authorize school districts and community schools to initiate a community learning center process to assist and guide school restructuring and to revise the law regarding academic distress commissions and other supports for lower performing school districts.

{¶ 112} By amending the title of H.B. 70 to include revisions to the law regarding academic-distress commissions, the legislature expanded the scope of the bill to reach well beyond its original purpose—the creation of community-learning centers. By amending the title, the legislature demonstrated that the amendments to H.B. 70 altered the purpose of the bill to the extent that it was required to amend the bill's title. For this court to decide otherwise is to ignore the obvious.

{¶ 113} The lead opinion concludes that both bills had the same common purpose—to improve underperforming schools. "Purpose" and "subject" are not synonymous; two different subjects could serve the same purpose. Administering intravenous antibiotics to someone with an infected limb or amputating that limb both serve the same purpose—getting rid of the infection. But the subject of those medical treatments, clearly, is not the same. In any event, the amendments to H.B. 70 were so significant that they overwhelmed the original purpose to create community-learning centers. No further proof is needed than the lead opinion's description of the amendments—those amendments had nothing to do with community-learning centers and they added an additional 67 pages to the original bill. To determine whether an amendment is germane to the subject matter of the proposed bill, we should inquire whether the new matter fits under the original title

of the bill. Using this test, it becomes apparent that the amendment sponsors themselves did not believe that the original title of H.B. 70 accurately described the bill as amended.

{¶ 114} The opinion concurring in part and concurring in judgment only in part in this case suggests that Article II, Section 15(C) of the Constitution is merely directory and is unenforceable in the courts. We have held that the three-consideration clause is directory. *See Hoover,* 19 Ohio St.3d at 4, 482 N.E.2d 575. But we long ago rejected the argument that a directory constitutional provision could not be enforced in the courts. We suggested in *Pim v. Nicholson*, 6 Ohio St. 176, 180 (1856), that "a manifestly gross and fraudulent violation of these rules might authorize the court to pronounce a law unconstitutional." And in *State ex rel. Dix v. Celeste*, 11 Ohio St.3d 141, 144, 464 N.E.2d 153 (1984), we explained that our "reluctance to interfere with the legislative process" would not cause this court to "abdicate in its duty to enforce the Ohio Constitution." We thus concluded, as we had suggested in *Pim*, that "a manifestly gross and fraudulent violation" of a directory constitutional provision "will cause an enactment to be invalidated." *Id*. at syllabus. *See also Voinovich*, 69 Ohio St.3d at 229, 631 N.E.2d 582. As this state's highest court, we have the obligation "to say what the law is." *State v. Parker*, 157 Ohio St.3d 460, 2019-Ohio-3848, 137 N.E.3d 1151, ¶ 31. And saying what the law is includes the duty to determine when a constitutional provision has been violated.

{¶ 115} The concurring opinion would simply overrule *Hoover* as unworkable on the ground that it requires us to review "every step of the legislative amendment process." Concurring opinion at ¶ 54. This is an exaggeration—the only review required of us in this case is whether H.B. 70 received the constitutionally required three considerations. And given that we have considered a mere handful of cases involving the three-consideration clause, concerns that Ohio courts will be intruding into the legislative process are unfounded.

{¶ 116} Appellees open their brief by referring to the adage that lawmaking is like sausage making—no one should see how either is made. But the hasty and covert efforts to amend the bill before it was enacted are important to recognizing the constitutional violation. As the first dissenting opinion notes, H.B. No. 70 was amended such that the original bill was vitally altered, the Senate Education Committee adopted the amendments, the Senate considered and passed the amended bill, the House considered the amended bill, and the House voted to concur in the amendments, all on the last day of the legislative session and in a matter of hours. Attempts by the original bill's sponsors and other stakeholders to see how this "sausage" was being made were thwarted at every turn. Enacting laws in this manner causes the public to lose faith in its government. And now, this court throws up its hands to sanction this type of lawmaking. But I believe that Article II, Section 15(C) of the Ohio Constitution and this court's precedents prohibit this type of lawmaking.

{¶ 117} Even if the parties in this case and all of the other actors involved desired to effectuate policy by creating a mechanism that would improve the education of children in the Youngstown city schools, the creation of an academic-distress commission in H.B. 70 was controversial to say the least. Hence, the amendment was cloaked in secrecy. But the public—particularly the parents, students, and educators in the Youngstown City School District—had the right to expect transparency in the enactment of legislation that directly affected them. What is more, the General Assembly had the legal responsibility to enact legislation as directed by the Ohio Constitution.

{¶ 118} Today's decision is the antithesis of the letter and spirit of Article II, Section 15(C). Make no mistake: today's decision will no doubt serve to encourage similar conduct in the future by whoever controls the majority in the legislature at any given time.

**{¶ 119}** Because I find that appellants met their burden and proved that the General Assembly enacted H.B. No. 70 in violation of Article II, Section 15(C) of the Ohio Constitution, I would reverse the judgment of the court of appeals. Since a majority of this court holds otherwise, I dissent.

––––––––––––––––––––

Roth, Blair, Roberts, Strasfeld & Lodge, L.P.A., James E. Roberts, David S. Barbee, Christine Z. Papa, and Edward L. Ostrowski Jr., for appellant Youngstown City School District Board of Education.

R. Sean Grayson, for appellant AFSCME Ohio Council 8, AFL–CIO.

Green, Haines, Sgambati Co., L.P.A., Ira J. Mirkin, and Charles W. Oldfield, for appellants Youngstown Education Association, Ohio Education Association, and Jane Haggerty.

Dave Yost, Attorney General, Benjamin M. Flowers, State Solicitor, and Michael J. Hendershot, Deputy Solicitor, for appellees.

Walter Haverfield, L.L.P., Sara Ravas Cooper, Christina Henagen Peer, and Sara M. Markouc, urging reversal for amicus curiae Canton City School District Board of Education.

Pepple & Waggoner, Ltd., Donna M. Andrew, Christian M. Williams, Brian J. DeSantis, and Samantha A. Vajskop, urging reversal for amicus curiae East Cleveland City School District Board of Education.

Baasten, McKinley & Co., L.P.A., Kathleen K. McKinley, Rachel M. Reight, and Brad Zebedis, urging reversal for amici curiae East Cleveland Education Association, OEA/NEA, and Lorain Education Association, OEA/NEA.

Bricker & Eckler, L.L.P., Bryan Smeenk, Maria J. Armstrong, and Nicole M. Donovsky, urging reversal for amici curiae Ohio School Boards Association, Buckeye Association of School Administrators, Ohio Federation of Teachers, Ohio Association of School Business Officials, Lorain City School District Board of Education, and Columbus City Schools Board of Education.

_____